**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**BEVERLY SUE MEADOWS,**

      **Plaintiff,**

**v.**                              **Case No.: 2:18-cv-00559**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 10, 11).

For the following reasons, the undersigned **RECOMMENDS** that the Court **GRANT** Plaintiff's motion for judgment on the pleadings to the extent that it requests remand of the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g);

**DENY** Defendant's request to affirm the decision of the Commissioner; **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this case, **with prejudice**, and remove it from the docket of the Court.

## I.    Procedural History

In December 2014, Plaintiff Beverly Sue Meadows ("Claimant"), completed an application for DIB, alleging a disability onset date of September 14, 2010 due to "scoliosis, neck problems and pain, rheumatoid arthritis, degenerative disc disease, two rods and plate in back, nerve damage in legs, bilateral hand numbness, rosacea, acid reflux, [and] hearing loss left ear." (Tr. at 182-83, 192). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 101, 113). Claimant filed a request for an administrative hearing, which was held on July 28, 2017 before the Honorable Raymond Rogers, Administrative Law Judge (the "ALJ"). (Tr. at 50-72). By written decision dated October 4, 2017, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act from her alleged onset date of September 14, 2010 through her date last insured on March 31, 2016. (Tr. at 30-38). The ALJ's decision became the final decision of the Commissioner on March 2, 2018 when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 8, 9). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 10), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF

11). Consequently, the matter is fully briefed and ready for resolution.

## II.    **Claimant's Background**

Claimant was 54 years old on her alleged onset date and 60 years old on her date last insured. (Tr. at 182). She completed high school and communicates in English. (Tr. at 191, 193). Claimant previously worked for over twenty years as an emergency dispatcher. (Tr. at 193).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which

is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of

4

"none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 31, 2016. (Tr. at 32, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since September 14, 2010, her alleged onset date, through her date last insured on March 31, 2016. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: degenerative disc disease of the lumbar and cervical spine. (*Id.*, Finding No. 3). The ALJ also considered Claimant's anxiety, depression, and hearing loss, but concluded that the impairments were non-severe. (Tr. at 33-34).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 34, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she must be allowed to stand and stretch for five minutes after each hour of work. She could occasionally climb ramps and stairs. She could frequently perform balancing, stooping, kneeling, crouching, crawling, handling, and fingering.

(Tr. at 35-37, Finding No. 5).

At the fourth step, the ALJ found that Claimant was capable of performing her past relevant work as an emergency dispatcher. (Tr. at 37-38, Finding No. 6). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 38, Finding No. 7).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. First, Claimant asserts that the ALJ failed to comply with 20 C.F.R. § 404.1545(a)(1) and Social Security Ruling ("SSR") 96-8p by not providing any explanation or support from the record for his RFC finding that Claimant must be allowed to stand and stretch for five minutes after each hour of work. (ECF No. 10 at 5-7). Claimant notes that the only reference in the record to the five-minute stretching breaks occurred during the ALJ's questioning of the vocational expert ("VE") at Claimant's administrative hearing. (*Id.*). The VE testified that a person with Claimant's characteristics and RFC could perform Claimant's past relevant work as an emergency dispatcher, even if she needed to stand and stretch for five minutes after each hour of work, but that such hypothetical person could not maintain competitive employment if the person instead needed to stand and stretch for ten minutes after every hour of work, unless other employees were afforded the same opportunity. (*Id.* at 7-8). Claimant asserts that "[t]he absence of evidence beyond the VE's testimony casts doubt on whether the ALJ's RFC assessment was tailored to his desired result by adopting a 5-minute break instead of a 10-minute break simply to avoid

6

an award of benefits" to Claimant. (*Id.* at 8).

In her second challenge, Claimant argues that the ALJ failed to determine in accordance with SSR 82-62 the physical and mental demands of her past relevant work as an emergency dispatcher before concluding that she could return to that job. (ECF No. 10 at 9). Claimant argues that this error was especially problematic because the ALJ found that Claimant had to stand and stretch for five minutes after each hour of work, yet the position of emergency dispatcher is defined by the United States Department of Labor as a position which requires the individual to perform under stress when confronted with emergency, critical, unusual, or dangerous situations. (*Id.* at 10). Claimant asserts that the ALJ did not explain how a person who must stand and stretch for five minutes after each hour of work to relieve pain and muscle spasms in her neck and back is able to stay on task during unpredictable emergency situations. (*Id.*). Therefore, Claimant contends that the ALJ also failed to comply with SSR 00-4p by not resolving an "obvious inconsistency" between the VE's testimony that Claimant could return to her past relevant work and the requirements of the emergency dispatcher position as described in the Dictionary of Occupational Titles ("DOT"), which were not conducive to Claimant's need to stretch for five minutes after every hour of work. (*Id.*). Claimant notes that the determination of whether she could return to her past relevant work was particularly important because if the sequential evaluation had proceeded beyond step four, Medical-Vocational Rule 201.14 likely would have directed a finding of disability at step five. (*Id.* at 11).

In response to Claimant's assertions of error, the Commissioner argues that the ALJ thoroughly explained why no further limitations were warranted in the RFC assessment beyond a reduced range of sedentary work with five-minute stretching

breaks. (ECF No. 11 at 5-7). According to the Commissioner, the ALJ's discussion of Claimant's modest objective abnormalities, generally unremarkable physical examinations, and largely successful treatment for her back pain and symptoms created the required "logical bridge" between the evidence of record and the assessed five-minute stretching limitation in Claimant's RFC. (*Id.* at 8). Further, the Commissioner asserts that Claimant fails to point to any evidence that would support a greater limitation. (*Id.*). As to the ALJ's conclusion that Claimant could return to her past relevant work, the Commissioner argues that the ALJ properly considered the VE's testimony concerning the demands of Claimant's past relevant work and whether a person with Claimant's characteristics and limitations could perform such work. (*Id.* at 12). Further, the Commissioner disputes that there is any conflict between the VE's testimony and the DOT. (*Id.* at 12-14).

## V.    **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The following evidence is most relevant to the issues in dispute.

### A. **Treatment Records**

#### *1. Prior to alleged onset of disability*

In July 2005, Claimant had a lumbar discectomy and posterior lumbar interbody fusion (PLIF) surgery. (Tr. at 288, 418, 424). She returned to her job as an emergency dispatcher. However, she continued to report low back pain to her primary care provider, Judy Spencer, Physician's Assistant (P.A.), who worked in collaboration with Wesley Olson, M.D. (Tr. at 288, 316, 318). X-rays taken in December 2009 showed osteopenia in Claimant's lumbosacral spine, status post fusion at L4-L5, and mild scoliosis. (Tr. at 315, 332). Claimant also reported neck and shoulder pain in January

through June 2010 for which she received epidural and trigger point injections administered by pain management physician, Timothy R. Deer, M.D. (Tr. at 390, 393, 397). Claimant reported relief from the injections, as well as from physical therapy and pain medications, but she continued to exhibit muscle spasms and decreased cervical range of motion on examination. (Tr. at 390, 391, 393, 395). Dr. Deer diagnosed Claimant with cervical spondylosis without myelopathy, cervical degenerative disc disease, myofascial pain syndrome, muscle spasm, shoulder pain, and cervical radiculitis. (Tr. at 391, 394, 395).

### 2. After alleged onset of disability

On October 1, 2010, Claimant followed up with Dr. Deer. Her chief complaint was increased pain in her left shoulder and neck for the past three weeks, which radiated into the top of her muscles. (Tr. at 381). Claimant stated that she had a lot of relief from the trigger point injection in her left shoulder in June and that Ultram and Lidoderm patches also provided her relief. (*Id.*). However, Claimant reported that she had been suffering from increased pain sitting at work. (*Id.*). On examination, Claimant had tenderness to palpation in her trapezius muscle and cervical spine. (Tr. at 383). She also had muscle spasms and reduced range of motion in her cervical spine. (*Id.*). Dr. Deer diagnosed Claimant with myofascial pain syndrome and muscle spasm. (Tr. at 384). He gave Claimant trigger point injections in the left side of her neck, shoulder, and back. (*Id.*). Dr. Deer noted that Claimant was deemed temporarily disabled due to severe pain. (*Id.*).

Claimant returned to Dr. Deer's office three months later on January 3, 2011. (Tr. at 377). She stated that the trigger point injection in her left shoulder provided good results and decreased her pain. (*Id.*). She continued to take Ultram and used Lidoderm

patches, as needed, which provided "good relief." (*Id.*). Claimant's only other complaint was "some" arthritic joint pain that corresponded to weather changes. (*Id.*). On examination, Claimant had muscle spasms in her cervical and lumbosacral spine. (Tr. at 379). She was tender to palpation in the left side of her neck with possible left-sided soft tissue swelling, and she had some cervical dystonia. (*Id.*). Dr. Deer diagnosed Claimant with cervical disc degeneration, myofascial pain syndrome, and muscle spasm. (*Id.*). He ordered further testing and recommended Botox injections as a possible treatment for her cervical dystonia. (Tr. at 380). The MRI that Dr. Deer ordered was taken on February 14, 2011. It did not show any disc herniation or spinal cord signal abnormality, but it showed that Claimant had significant cervical spondylosis due to degenerative changes. (Tr. at 388-89).

On September 26, 2013, Claimant saw P.A. Spencer for her annual check-up. (Tr. at 333). Claimant's back was very tender on examination and she was assessed to have cervical pain. (*Id.*). At her next annual visit with P.A. Spencer on December 4, 2014, Claimant stated that chronic low back pain was her "only problem." (Tr. at 334). Claimant related that she believed that she was going to obtain disability benefits due to her back issues. (*Id.*). Claimant returned to P.A. Spencer shortly thereafter on December 16, 2014, advising that she was unable to get in to see Dr. Deer, and she was having back and neck pain. (Tr. at 335). On examination, "pretty much" all of Claimant's spine was tender to palpation. (*Id.*). P.A. Spencer planned to take x-rays of Claimant's back and prescribed Neurontin. (*Id.*). She advised Claimant that she could also take Tylenol for pain relief. (*Id.*).

On December 30, 2014, Claimant presented to neurosurgeon John H. Schmidt, III, M.D., at the referral of her primary care providers, Dr. Olson and P.A. Spencer. (Tr.

at 288). On examination, Claimant's gait was non-antalgic and she appeared to be in no acute distress. (Tr. at 289). Claimant had full range of motion in her neck with some limitations in left lateral bending, but she did not have any significant pain with range of motion, full motor strength in her upper extremities, normal reflexes, and she did not have any spasticity, clonus, or Hoffman's sign. (*Id.*). Dr. Schmidt reviewed Claimant's September 2008 cervical spine MRI, which showed multi-level degenerative disc disease, but no significant canal stenosis at any level or abnormal cord signal. (*Id.*). Dr. Schmidt's impression was that Claimant had neck pain with cervical spondylosis, which did not require any surgical intervention. (*Id.*). Rather, Dr. Schmidt recommended that Claimant continue to practice yoga, as it seemed to help her pain, and he planned to refer Claimant back to Dr. Deer for evaluation and possible injections. (*Id.*).

On February 11, 2015, Claimant returned to Dr. Deer after last seeing him in May 2010. (Tr. at 414). Claimant's chief complaint was low back pain that extended into her hips and left leg. She also continued to have neck pain and numbness in her upper extremities. (*Id.*). Claimant stated that sitting too long worsened her pain and that her pain eased some when she lay down, stood, or walked. (*Id.*). Claimant's cervical and lumbar spine were tender to palpation and she had muscle spasms around her lumbosacral spine. (Tr. at 417). Claimant had impaired sensation in her hands and fingers, reduced motor strength in her lower extremities, and abnormal ankle jerk reflexes. (*Id.*). Dr. Deer reviewed Claimant's December 23, 2014 CT scans. (*Id.*). He noted that Claimant had prominent degenerative change with degenerative disc disease in her cervical spine, a disc protrusion at L3-L4 in her lumbar spine, post-operative change with fusion at L4-L5, and prominent degenerative disc disease with space narrowing and vacuum phenomena at L5-S1. (*Id.*). Dr. Deer diagnosed Claimant with

lumbar disc degeneration and spondylosis and cervical and lumbar radiculopathy. (Tr. at 418). He gave Claimant facet joint and transforaminal injections, ordered EMGs of Claimant's extremities and a lumbar spine MRI, and referred Claimant back to Dr. Schmidt for a surgical opinion due to Claimant's new onset of right leg weakness in addition to her chronic left leg weakness. (Tr. at 418-19).

Claimant's EMG tests were conducted later that month on February 25, 2015. All of her nerve conduction studies were within normal limits, but there was evidence of C8-T1 radiculopathy on both sides of Claimant's body. (Tr. at 423). There was no evidence of focal nerve entrapment or generalized peripheral neuropathy. (*Id.*). Claimant's lumbar spine MRI taken on March 13, 2015 showed a moderate-sized broad-based disc protrusion at L3-L4, areas of neural foraminal narrowing, a Tarlov cyst at S2, and degenerative and postsurgical changes. (Tr. at 424-25).

On April 13, 2015, Claimant returned to Dr. Deer to review the results of her lumbar spine MRI. Her back was "doing pretty well." (Tr. at 409). Her lumbar pain was improved when she stood, took a hot bath, took Ultram, or used Lidoderm patches. (*Id.*). Claimant also had neck pain and numbness in her arms, hands, and fingers. (*Id.*). The pain worsened when she talked on the telephone and bent her neck to the right, or when she used her hands above her chest level. (*Id.*). On examination, Claimant's arms were weak. (Tr. at 411). Given the fact that Dr. Schmidt did not recommend further surgery, Dr. Deer suggested a trial spinal cord stimulator to determine if a permanent implant would be a viable option. (Tr. at 412). Claimant was also scheduled to receive lumbar facet and trigger point injections, which were administered the following day. (Tr. at 409, 440). Claimant was given additional trigger point injections in her lumbar spine, along with a lumbar epidural steroid injection on April 23, 2015, and a third round of

trigger point injections and lumbar facet joint injections on April 28, 2015. (Tr. at 402, 405, 437).

Within that time frame, on April 23, 2015, Claimant saw neurologist, Darshan Dave, M.D., for evaluation of her reported intermittent weakness, numbness, muscle spasms, and pain radiating from her lumbar region. (Tr. at 348). Her motor strength and muscle tone were normal in all of her extremities; she did not have any atrophy or abnormal movements; and her reflexes, sensation, coordination, and gait were normal. (Tr. at 349).

On May 7, 2015, Dr. Deer gave Claimant another transforaminal epidural steroid injection in her lumbar spine. (Tr. at 399). The following month, on June 1, 2015, Claimant reported fifty percent improvement from her lumbar transforaminal epidural steroid injections and lumbar facet joint injections. (Tr. at 426). Claimant also continued to use Lidoderm patches and Ultram. (*Id.*). Claimant's gait was antalgic and her lumbosacral spine extension was abnormal, but slightly improved. (Tr. at 428). Her straight leg raising test was negative and her knee jerk reflexes were normal. (*Id.*). Dr. Deer diagnosed Claimant with lumbar disc degeneration, spondylosis, post laminectomy syndrome, and radiculopathy. (*Id.*). She was continued on her current treatment plan. (Tr. at 429).

On August 31, 2015, Claimant followed up with Dr. Deer. She continued to have back pain but was doing well since the injections that she received in May. (Tr. at 458). She stated that her pain was worse when she sat in one position and eased when she was up moving around. (*Id.*). Ultram continued to provide some relief and she continued to use Lidoderm patches. (*Id.*). On examination, Claimant's straight leg raising tests were negative and her knee jerk reflexes were abnormal, but equal. (Tr. at 460). Dr. Deer

recommended continued conservative therapy. (Tr. at 461).

On November 30, 2015, Claimant again saw Dr. Deer for a three-month follow-up appointment. (Tr. at 513). She continued to have low back pain, but her pain was better overall. (*Id.*). Claimant had weakness in her hands and lower extremities, an antalgic gait, and muscle atrophy in her hands. (Tr. at 515). Her lumbar spine was tender to palpation and her extension was limited to 15 degrees. (*Id.*). Claimant was diagnosed with osteoarthritis in her hands, lumbar spondylosis, and lumbar radiculopathy. (Tr. at 515-16). Claimant was referred to physical therapy to improve her strength and function. (Tr. at 516).

On February 12, 2016, Claimant told a physician assistant at Dr. Deer's office that physical therapy provided her excellent relief. (Tr. at 520). Claimant's lumbosacral spine was no longer tender to palpation and she had no muscle spasms. (Tr. at 521). Her straight leg raising test was negative and her gait was non-antalgic. (*Id.*).

### 3. After date last insured

On July 11, 2016, Claimant followed up with Dr. Deer. She continued to have low back, hip, leg, and ankle pain, but stated that her pain was tolerable and she did not need any injections. (Tr. at 526). Claimant continued taking Ultram and using Lidoderm patches with good relief. (*Id.*). She was continued on her conservative treatment plan. (*Id.*).

On January 9, 2017, Claimant reported to Dr. Deer that over the prior two months, she was experiencing sharp pain in the left side of her head when bending her head forward. (Tr. at 527). She also still had low back pain, but it was non-radiating at that time. (*Id.*). The pain was worse when she sat in one position for too long and it was also exacerbated by cold weather. (*Id.*). Dr. Deer recommended cervical facet joint and

14

trigger point injections and physical therapy. (Tr. at 530-31). Claimant's cervical spine x-ray taken that month on January 17, 2017 showed "probably [a] slight progression" in her degenerative disc disease as compared to December 2014. (Tr. at 543).

On February 6 and 20 and March 2 and 21, 2017, Claimant had trigger point and facet injections to address her neck pain, which extended into her left shoulder, back, and head. (Tr. at 550, 555, 561, 564). On May 5, 2017, she reported 75 percent relief from the injections and a total reduction in headaches. (Tr. at 571).

On June 13, 2017, Claimant was again referred to Dr. Schmidt for evaluation of her back and leg pain. (Tr. at 538). Dr. Schmidt did not find any acute surgical indications. (Tr. at 540). However, Dr. Schmidt suggested that Claimant see a neurologist for her spasms and weakness and continue seeing Dr. Deer for pain management and injections, as the treatment provided relief in the past. (*Id.*).

On August 7, 2017, Claimant presented to Dr. Deer for a regular three-month examination. (Tr. at 46). Claimant's chief complaints were still neck and low back pain. (*Id.*). Claimant stated that she had constant numbness in her fingers and that lifting or standing for extended periods of time made the pain worse. (*Id.*). However, Claimant related to Dr. Deer that walking for short periods eased her pain and that her neck pain was improved from the facet injections in March. (Tr. at 46, 49). The muscle relaxer cyclobenzaprine also provided Claimant relief. (Tr. at 46). On examination, Claimant had full range of motion and no tenderness to palpation in her cervical spine. (Tr. at 48). Her straight leg raising test was negative. (*Id.*). Her reflexes and motor strength were normal. (*Id.*). Dr. Deer diagnosed Claimant with cervical spondylosis without myelopathy, cervical radiculopathy, and myofascial pain syndrome. (Tr. at 48-49). Given the fact that Claimant's pain was markedly improved from the injections and her

15

cervical range of motion was normal, Dr. Deer stated that Claimant should continue injections as needed for exacerbation of pain, use ice, and continue conservative therapy.

### B. Evaluations and Opinion Evidence

On April 15, 2015, Claimant was examined by Arturo Sabio, M.D., for the West Virginia Disability Determination Service. Regarding her medical history, Claimant related that in 2005 she had a spasm in her lower back and the pain persisted. (Tr. at 340). She had a discectomy and fusion in her lumbar spine and returned to work three months later. (*Id.*). Then, in 2009, Claimant developed pain in her left shoulder, neck, and upper back. (*Id.*). Claimant stated at the time of the evaluation that she suffered from constant pain in her cervical and lumbar spine, which radiated to all four of her extremities. (*Id.*). In addition to back pain, Claimant complained of numbness in her hands and fingertips and numbness in the lateral aspect of her lower legs, which Dr. Sabio noted was presumably nerve damage from her operation and fusion. (Tr. at 341). Claimant was also diagnosed with rheumatoid arthritis. (*Id.*). In terms of her functional abilities, Claimant explained that she could only carry approximately ten pounds and that her lumbar pain worsened after sitting for more than 30 minutes or riding in a car for more than 30 miles. (Tr. at 340-41). She also advised Dr. Sabio that standing and ambulation worsened her pain and she needed to sit down after approximately 45 minutes of activity. (Tr. at 341). Claimant was taking Ultram and Neurontin, as well as using Lidoderm patches, for pain relief. (*Id.*).

On examination, Claimant had a normal gait and was stable at station. (*Id.*). However, her thoracolumbar spine and lumbar muscles were tender to palpation and her range of motion was limited in her cervical spine. Her straight leg raising and lumbar flexion were also limited due to pain and stiffness. (Tr. at 343). (*Id.*). Claimant's

neurological examination was normal. (*Id.*).

On May 5, 2015, Rogelio Lim, M.D., assessed Claimant's RFC based upon a review of her records, including the results of her consultative examination. Dr. Lim opined that Claimant could perform work at the light exertional level that involved only occasional postural activities, except that Claimant could never climb ladders, ropes, or scaffolds, and that Claimant should avoid concentrated exposure to environmental conditions. (Tr. at 79-80). Rabah Boukhemis, M.D., affirmed this RFC assessment on August 10, 2015. (Tr. at 94-95).

On August 17, 2015, Claimant had a mental status examination in connection with her application for social security disability benefits. Claimant related that she was a retired 911 dispatcher and was receiving a pension. (Tr. at 367). She also planned on re-applying for disability benefits after being previously denied. (*Id.*). Claimant had never been married and did not have any children. (*Id.*). She stated that she left her home once or twice a week and enjoyed reading, sewing, and watching television. (Tr. at 368). She got along well with her parents and sisters and also kept in touch with some of her prior co-workers. (*Id.*). In a typical day, Claimant took care of her personal hygiene, made simple meals, and performed some outside chores, such as "feeding and watering the animals." (Tr. at 369). Claimant also visited her mother in a nursing home every Sunday morning. (*Id.*).

### C. VE's Testimony

At Claimant's administrative hearing, the VE testified that Claimant's past relevant work as an emergency dispatcher was a sedentary, semi-skilled position with a specific vocational preparation number of four and a representative DOT number of 379.362-010. (Tr. at 66). The ALJ inquired whether someone of Claimant's age;

education; vocational profile; and RFC, including the limitation that she must be able to change positions for five minutes after every hour of work, could perform Claimant's past job as an emergency dispatcher. (Tr. at 67). The VE explained that the DOT did not address the need to change positions, but based on the VE's knowledge and expertise, such a hypothetical individual could perform Claimant's past work. (*Id.*). In response to a second hypothetical, the VE explained that if the same hypothetical individual needed to stand up and stretch for ten minutes after every hour of work, the person would not able to perform Claimant's past work, if other employees were not given the same accommodation. (Tr. at 68).

### D. Claimant's Statements

On January 2, 2015, Claimant completed a work history report regarding her past employment as a 911 dispatcher. (Tr. at 56, 202-04). Claimant stated that her job consisted of answering the phone, typing, filing, computer work, talking on the radio, and writing. (Tr. at 203). Claimant stated that for eight hours per day she sat; reached; and wrote, typed, or handled small objects. (*Id.*). She recorded that she did not leave her work station "until relief came," even if it meant working a double shift. (*Id.*). Claimant also stated that she carried filing boxes approximately twenty feet once per month. (*Id.*). The heaviest weight that she lifted in that position was 50 pounds, but she frequently lifted less than ten pounds. (*Id.*).

At her administrative hearing on July 28, 2017, Claimant testified regarding her medical impairments and explained that she could no longer work because of "back issues." (Tr. at 56). Claimant stated that sitting was uncomfortable because her left leg and hand would become numb. (Tr. at 57). Also, she stated that it was painful for her to bend her neck to look down. (*Id.*). Claimant testified that she could sit for approximately

18

20 minutes before needing to switch positions and that she could stand for an hour at the most before needing to sit back down. (Tr. at 58). Claimant stated that she was concerned about her doctor's suggestion of a cervical cord stimulator because her previous back surgery caused her significant nerve damage on her left side. (Tr. at 59). Claimant acknowledged that injections in her neck provided some relief. (Tr. at 60). However, her neck pain radiated into her left arm and hand and sometimes also on her right side. (*Id.*). Claimant testified that in a typical day she fixed breakfast, watched "a little news," and went outside "for a little bit." (Tr. at 62). She also sometimes read. (*Id.*). Claimant stated that she did not think that she could return to her prior work as an emergency dispatcher due to issues with her "back and hands." (Tr. at 65). She did not believe that she could handle that job any more due to pain. (*Id.*).

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the United States Court of Appeals for the Fourth Circuit defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589

(4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

### A.   RFC Assessment

In her first challenge to the Commissioner's decision, Claimant contends that the ALJ did not provide any explanation or support for his RFC finding that she must stand and stretch for five minutes after each hour of work, as opposed to standing and stretching for ten minutes, or any other period of time for that matter. (ECF No. 10 at 5-7). Claimant argues that the lack of explanation precludes meaningful review of the RFC finding by the Court. Also, Claimant indicates that the error cannot be considered harmless given the fact that there was no medical evidence or opinion in the record suggesting the five-minute limitation, and the five-minute limitation significantly impacted the determination of whether Claimant could return to her past relevant work.

SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a

function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ should assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR § 404.1545(b-d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

As the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") recently emphasized, "a proper RFC analysis has three components: (1) evidence, (2)

logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019), *as amended* (Feb. 22, 2019) (citations omitted). Critically, the "second component, the ALJ's logical explanation, is just as important as the other two." *Id*. Indeed, Fourth Circuit "precedent makes clear that meaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion." *Id*.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, the ALJ concluded at step two of the sequential evaluation that Claimant's severe impairments included degenerative disc disease of the lumbar and cervical spine. (Tr. at 32). In assessing Claimant's RFC, the ALJ noted Claimant's allegations that her pain increased if she sat for too long. (Tr. at 35). The ALJ then discussed the medical evidence regarding Claimant's lumbar and cervical spine, which the ALJ described as showing only modest objective abnormalities and largely normal or benign clinical findings on examination. (Tr. at 36-37). The ALJ also discussed the fact that no further surgery was indicated for Claimant and that injections, physical therapy, and medications were successful in improving her symptoms. (Tr. at 37). The ALJ stated that he gave little weight to the opinions of the state agency medical consultant that Claimant could perform a range of light work because the consultants did not have the benefit of reviewing the fully developed record, nor did they examine or observe Claimant. (*Id*.). The ALJ then summarily concluded that Claimant had the

RFC to perform a reduced range of sedentary work in which she could stand and stretch for five minutes after each hour of work. (Tr. at 35-37).

Claimant correctly argues that the ALJ did not provide any explanation for his assessment that Claimant would need to stand and stretch for a period of five minutes at the frequency of every hour of work. Indeed, the ALJ did not provide any meaningful analysis of Claimant's ability to sit, stand, and alternate positions at all. Rather, the ALJ erroneously proceeded straight from his discussion of the medical record to his RFC finding without building any logical bridge from evidence to conclusion. *Thomas*, 916 F.3d at 311; SSR 96-8p. For the reasons discussed below, Claimant's ability to sit, stand, and alternate between sitting and standing were unequivocally relevant functions for which there was contradictory evidence that merited explicit discussion by the ALJ. *Mascio*, 780 F.3d at 636. The ALJ's complete lack of explanation for limitations that he imposed in these functional areas renders the RFC assessment incapable of meaningful review.[1] *Id.*

Moreover, the five-minute limitation that the ALJ imposed was not reflected in any treatment note, medical opinion, or in Claimant's statements such that the basis of the RFC finding could even be gleaned from the record. Rather, the evidence was contradictory on that point and none of it corresponded to the ALJ's finding. Claimant stated in January 2015 and July 2017 that she could sit for 20 or 30 minutes, respectively, before she needed to switch positions due to back pain and numbness in her extremities. (Tr. at 57-58, 340). Conversely, the state agency physicians who reviewed the results of Claimant's April 2015 consultative examination and other

---

[1] Claimant does not pose any challenge to the ALJ's analysis of other functions, such as her postural and environmental restrictions. However, the ALJ's analysis of these functions was also sorely lacking.

records concluded that Claimant could sit for six hours in a workday with only normal breaks. (Tr. at 79, 94). The ALJ ultimately did not give full credence to any of this evidence, explaining that Claimant's statements were not entirely consistent with her medical records and that the state agency consultants did not have the benefit of reviewing the entire record, nor did they observe or examine Claimant. (Tr. at 35, 37). However, while the ALJ provided some explanation of why he discredited Claimant's statements and the opinion evidence, the ALJ did not proceed to explain how he determined the five-minute, every hour, stretching limitation in Claimant's RFC.

While an ALJ is not obligated to base each conclusion in the RFC assessment on a specific piece of evidence, an ALJ must *consider* all relevant evidence in the record and reach a determination of a claimant's RFC that is supported by substantial evidence. *Fruit v. Colvin*, No. 2:14-CV-07643, 2015 WL 1021309, at *22 (S.D.W. Va. Mar. 9, 2015); 20 C.F.R. § 404.1545(a)(1); SSR 96–8p, 1996 WL 374184, at *5. In the present case, the ALJ discussed that Claimant's medical evidence showed modest objective and clinical abnormalities and largely successful treatment, yet the ALJ nevertheless concluded that Claimant was restricted to less than a full range of sedentary work, with a highly specific limitation that she must stand and stretch for five minutes at a time after each hour of work. Without knowing the ALJ's analysis of Claimant's functional abilities and the basis for the RFC conclusion, the Court cannot determine whether it is supported by substantial evidence. *See, e.g., Fisher v. Comm'r, Soc. Sec.*, No. RDB-17-3165, 2018 WL 3348858, at *3 (D. Md. July 9, 2018), *report and recommendation adopted,* 2018 WL 5309788 (D. Md. Aug. 1, 2018) (recommending remand where the ALJ did not provide explanation or support for the "extremely specific conclusion" in the RFC assessment as to how often and how long the claimant needed breaks due to being off task).

Furthermore, the ALJ's error cannot be considered harmless. The ALJ determined at step four of the sequential evaluation that Claimant could return to her past relevant work as an emergency dispatcher. The VE testified that someone with Claimant's RFC could return to that job if the person needed to stand and stretch for five minutes after each hour, but that the job would be eliminated if the person needed to instead stand and stretch for ten minutes after each hour of work, if other employees were not afforded the same opportunity. As the five-minute standing and stretching restriction was clearly key to the ALJ's step-four decision, the ALJ was obligated to sufficiently explain the basis for such finding. *See, e.g., Fisher*, 2018 WL 3348858, at *3 (stating that an explanation of how the ALJ determined the percentage of time that the claimant would be off-task was significant because a relatively small increase could preclude competitive employment). Particularly where, as here, the step-four decision arguably made the difference between a finding of "not disabled" and a directed finding of "disabled" at step five under the Medical-Vocational Rules.

Therefore, because the ALJ's RFC discussion lacks sufficient analysis and explanation for the ALJ's conclusion that Claimant needed to stand and stretch for five minutes after each hour of work and the undersigned cannot conclude that the ALJ's error was harmless, the undersigned **FINDS** that the Commissioner's decision is not supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** so that the ALJ may reconsider or elaborate on the five-minute stretching limitation in Claimant's RFC. On remand, the ALJ should properly assess Claimant's ability to sit, stand, and alternate between sitting and standing by citing evidence in support of the ALJ's conclusions.

### B.    Step Four Analysis

Claimant next argues that the ALJ failed to comply with SSR 82-62 by not making a finding of fact regarding the physical and mental demands of Claimant's past work as an emergency dispatcher before determining that Claimant could return to such position. (ECF No. 10 at 9). Claimant further states that the ALJ failed to comply with SSR 00-4p because the ALJ failed to resolve an "obvious inconsistency" between the VE's testimony and the DOT. Claimant states that the Department of Labor defines the job of emergency dispatcher as requiring speed and sustained attention under stress during emergency situations. (*Id.* at 10). Claimant states that the ALJ did not ask the VE to explain, nor did the ALJ himself explain, how a person could stay on task during emergency situations while stretching for five minutes after every hour of work. (*Id.*).

Under the fourth step of the sequential evaluation process, the ALJ must determine a claimant's RFC, and in turn ascertain whether the claimant is capable of performing past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Past relevant work is "work that [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the individual] to learn to do it." 20 C.F.R. § 404.1560(b)(1); *see also* 20 C.F.R. § 404.1565(a).

Social Security Ruling 82-61 and Social Security Ruling 82-62 both provide guidance as to how the ALJ determines whether a Claimant is capable of doing past relevant work. Social Security Ruling 82-61 cautions that "finding that a claimant has the capacity to do past relevant work on the basis of a generic occupational classification of the work is likely to be fallacious and unsupportable." SSR 82-61, 1982 WL 31387, at *1 (S.S.A. 1982). Instead, the ALJ must determine if "the evidence shows that a claimant retains the RFC to perform the functional demands and job duties of a particular past

relevant job as he or she actually performed it," or in the alternative "if the claimant cannot perform the excessive functional demands and/or job duties as actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy." *Id.* at *2. If so, then the claimant should be found "not disabled." *Id.*

Under Social Security Ruling 82-62, in order to find that a claimant can perform a past relevant job, the ALJ's decision "must contain among the findings the following specific findings of fact: (1) A finding of fact as to the individual's RFC. (2) A finding of fact as to the physical and mental demands of the past job/occupation. (3) A finding of fact that the individual's RFC would permit a return to his or her past job or occupation." SSR 82-62, 1982 WL 31386, at *4 (S.S.A. 1982); *see also Harris v. Secretary, Dep't of Health and Human Servs.*, No. 88-3113, 1989 WL 7013, at *2 (4th Cir. 1989) (holding that the ALJ "must determine precisely the activities involved in the claimant's former job or activities and the activities that the claimant is capable of performing"). SSR 82-62 further instructs that "[t]he claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work." SSR 82-62, 1982 WL 31386, at *3. Thus, the ALJ must engage in careful appraisal of:

> (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles*, etc., on the requirements of the work as generally performed in the economy.

*Id.* "The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision." *Id.* Furthermore, "an ALJ's duty to further develop the record concerning a claimant's past relevant work arises when the ALJ is alerted by the record to the presence of an issue on the subject of past relevant work." *Adams v. Colvin*, No. 2:13–cv–00019–FDW–DSC, 2014 WL 1713775, at *8 (W.D.N.C. May 1, 2014) (quoting *Floyd v. Astrue*, No. 3:10-cv-474, 2011 WL 4946311, at *4 (W.D.N.C.  Jun. 6, 2011)).

In the present matter, the ALJ solicited testimony from the VE regarding Claimant's vocational profile at Claimant's administrative hearing. (Tr. at 66). The VE testified that Claimant's past work as an emergency dispatcher was a sedentary, semi-skilled job with a standard vocational preparation rating of 4 and a representative DOT number of 379.362-010. (Tr. at 66). The ALJ then questioned the VE if someone of Claimant's age, education, work history, and RFC could perform such job and the VE answered affirmatively. (Tr. at 67). The ALJ's reliance on the vocational expert's testimony satisfied the mandate of SSR 82-62. *See Thompson v. Astrue*, 442 F. App'x 804, 807 (4th Cir. 2011) (holding that the ALJ made the required findings regarding the physical and mental demands of the claimant's past work by asking the VE about the nature of the previous work to which the expert testified as to the skill and exertional levels of the position); *Gunnoe v. Colvin*, No. 2:15-CV-12145, 2016 WL 5346956, at *5-7 (S.D.W. Va. Sept. 23, 2016) (stating that the "ALJ need not describe the physical and mental demands of a claimant's past work himself where he relies on the testimony of a vocational expert" and finding that the ALJ "substantially complied with the procedures set forth in SSR 82-62" by relying on the VE's classification of the claimant's past work

and testimony that a hypothetical person of Claimant's age, education, work history, and RFC could perform that job) (collecting cases).

Claimant relies on this Court's ruling in *Koch v. Colvin*, No. 2:13-CV-6780, 2014 WL 2589590 (S.D.W. Va. June 10, 2014) to support her contention that the ALJ did not make the required finding of fact as to the physical and mental demands of Claimant's past work as required by SSR 82-62. In *Koch*, the ALJ concluded that the claimant, who was limited to light level work, could return to her past relevant job as a cashier. *Koch*, 2014 WL 2589590, at *28. However, the claimant described her past job as a deli cashier, which required her to do more than run a register, such as requiring her to lift gallons of water, coolers, and ice bags, as well as carry food items, serve food, stock shelves, sweep, and mop. *Id*. The VE indicated that the work of a deli prep worker, deli stock clerk, and cook were all considered medium exertional work and the job of a cleaner or janitor was light to medium work. *Id*. Therefore, remand was necessary in *Koch* for the ALJ to address the physical and mental demands of the claimant's past work and determine if her light level RFC would permit her to return to that job. *Id*. *Koch* simply has no application in the instant matter. *See, e.g., Gunnoe*, 2016 WL 5346956, at *7 n.8 (distinguishing *Koch*).

Next, Claimant asserts that the ALJ failed to comply with SSR 00-4p at step four of the sequential evaluation. SSR 00-4p requires an ALJ to "inquire, on the record" whether a vocational expert's testimony conflicts with the DOT. 2000 WL 1898704, at *2. In addition, "[w]hen there is an apparent unresolved conflict between [vocational expert] ... evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict." *Id*. Ultimately, SSR 00-4p requires an ALJ to "resolve" any such conflict

"before relying on the [vocational expert] ... evidence to support a determination or decision about whether the claimant is disabled." *Id.*

As to Claimant's ability to perform her past relevant work despite her need to change positions for five minutes after every hour, the VE specifically explained that the DOT did not address the changing of positions. However, the VE stated that based on her knowledge and experience, a person who needed to stand and stretch for five minutes after every hour of work could perform Claimant's past relevant work as an emergency dispatcher. Therefore, Claimant fails to show any apparent unresolved conflict between the ALJ's testimony and the DOT. Nonetheless, as previously discuss, the ALJ's RFC decision is not supported by substantial evidence and the undersigned recommends that the matter be remanded on that basis.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 10), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 11); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code,

Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** April 11, 2019

Cheryl A. Eifert
United States Magistrate Judge